COURT OF APPEALS
DECISION
DATED AND FILED

December 16, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1802**

**STATE OF WISCONSIN**

Cir. Ct. No. **2008FA304**

**IN COURT OF APPEALS
DISTRICT IV**

IN RE THE MARRIAGE OF:

JAMES T. MURPHY,

   PETITIONER-RESPONDENT-CROSS-APPELLANT,

V.

NANCY C. HOLLAND,

   RESPONDENT-APPELLANT-CROSS-RESPONDENT.

APPEAL and CROSS-APPEAL from a judgment and an order of the circuit court for Dane County: JULIE GENOVESE, Judge. *Affirmed in part; reversed in part and cause remanded with instructions.*

Before Blanchard, P.J., Fitzpatrick, and Graham, JJ.

¶1   GRAHAM, J.  When James Murphy and Nancy Holland divorced in 2010, Holland was awarded indefinite spousal maintenance as a percentage of

Murphy's income. Holland appeals a subsequent judgment of the circuit court, entered in 2020, that granted Murphy's motion to terminate maintenance. She argues that the court erred when it determined that there had been a substantial change in the parties' financial circumstances and, further, that the court's decision to terminate maintenance constituted an erroneous exercise of discretion. We conclude that the court did not erroneously terminate maintenance.

¶2     Murphy cross-appeals the provision of the circuit court's 2020 judgment and a subsequent order requiring him to pay a portion of Holland's attorney fees. We reject the majority of Murphy's arguments. However, as explained below, we conclude that the court did not make one finding necessary to support a fee award under WIS. STAT. § 767.241(1)(a) (2019-20).[1]

¶3     Accordingly, we reverse the portions of the 2020 judgment and the subsequent order pertaining to the attorney fee award, affirm all other aspects of the judgment and order, and remand to the circuit court for further consideration of the attorney fee issue and to make any findings necessary to support its decision.

## BACKGROUND

¶4     The circuit court proceedings leading to this appeal were fact-intensive and prolonged. We limit our focus to the facts that are pertinent to the parties' arguments on appeal. When possible, we recite the facts as they were stated in circuit court and arbitration orders, and we supplement the facts from other sources in the record as needed.

_____

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

2

¶5      Murphy and Holland were divorced in 2010 after a thirty-year marriage.  At the time of the divorce, Murphy was fifty-four years old and Holland was fifty-five.  Murphy worked as an emergency room physician for multiple employers in different states, and his income fluctuated from month to month. Holland was a stay-at-home mother and homemaker.

¶6      In the months leading up to the 2010 judgment of divorce, the parties agreed that Murphy would pay indefinite spousal maintenance to Holland. However, they disagreed on the amount of the maintenance payments and other matters, such as how the parties' substantial marital debt would be paid.  The parties stipulated that they would resolve these and other contested matters through binding arbitration.

¶7      As relevant here, the arbitrator developed a plan for the parties to pay off the marital debt, and also determined the amount of maintenance and a system by which it would be paid.  Specifically, the arbitrator ordered that, after paying marital debt, Murphy would pay half of his gross income to Holland (after it was adjusted for any income imputed to Holland).  The arbitrator also ordered annual "true-ups" prepared by the parties' accountant to ensure that the proper amount was paid to Holland each year.  These provisions were incorporated into the 2010 divorce judgment, which also provided that disputes over the calculation or modification of maintenance would be submitted to binding arbitration.

¶8      In 2012, after Holland alleged that Murphy was hiding income, the parties once again engaged in binding arbitration with the same arbitrator.  The arbitrator determined that Murphy had underpaid his maintenance obligation and ordered him to pay arrearages.  The arbitrator also modified the system for paying maintenance and marital debts.  Moving forward, Murphy would deposit all

paychecks into a joint account, over which Holland would have exclusive control. Holland would pay both parties' marital debts from this account, and then, after making adjustments for her imputed earnings, she would divide the remaining funds equally between herself and Murphy. The annual true-ups would continue. The arbitrator ordered Murphy to adjust his tax withholding to maximize the funds deposited into the joint account, and ordered Holland to use her best efforts "to manage bill payments in a manner that leaves sufficient funds for each party's daily personal and business activities." These changes were memorialized in an amended arbitration award, which we refer to as the "2012 arbitration award."

¶9    The parties continued to have conflicts over maintenance and arrearages. In August 2014, Holland sought and obtained contempt sanctions on the grounds that Murphy had failed to make arrearage payments ordered by the arbitrator and had stopped depositing his paychecks into the joint account.

¶10    Then, in December 2015, Murphy sought to modify or terminate maintenance based on, among other things, changes in his income and employment and the recent loss of his Medicare billing privileges as a physician.[2] Murphy emailed the arbitrator, indicating that he could not pay the cost of arbitration, and the arbitrator, in turn, withdrew from participation and referred the matter back to the circuit court. During the proceedings that followed, Murphy also sought to reduce the arrearages he owed based on alleged miscalculations by the accountant who conducted the annual true-ups. Holland responded by seeking contempt sanctions on grounds that Murphy had failed to pay maintenance

_____

[2] It appears that Murphy initially lost his Medicare billing privileges in 2015, that he regained his privileges at some point during the trial, and that he lost his privileges again in December 2020, shortly after the court issued the 2020 judgment.

4

arrearages and was hiding income. Murphy filed his own contempt motions, alleging that Holland was willfully managing the joint account in a way that deprived him of the use of any income. By the time the proceedings were over, multiple contempt motions had been filed by both parties.

¶11 Starting in March 2017, the circuit court commenced what ended up being an eight-day trial spanning several years. The issues set for trial were the parties' competing contempt motions, their dispute over the amount of maintenance arrearages, and Murphy's motion to modify or terminate maintenance.

¶12 After four days of trial in March and April 2017, the trial was postponed for more than two years due to uncertainty regarding Murphy's continued employment and expected income. During this time, the circuit court held numerous status conferences and hearings to address issues related to the parties' financial circumstances and Murphy's fluctuations in income. Following a status conference, the court entered what we refer to as the "May 2018 order." In the May 2018 order, the court anticipated that the trial would resume and, at Murphy's request, the court addressed his "maintenance obligations in the interim." The court ordered that, given his "changed employment circumstances," Murphy would pay Holland "a set amount of $10,000 each month in maintenance payments effective [on a date certain] and continuing until the next hearing."

¶13 The circuit court held the final four days of trial in July 2019. During this phase of the trial, the parties entered into stipulations resolving the amount of Murphy's maintenance arrearages and the contempt motions. The parties stipulated that Murphy owed Holland $285,148.50 in arrearages, and that he would pay an additional $100,000 toward Holland's attorney fees to "purge his

contempt." The parties represented that the stipulations resolved all contempt motions filed by both parties. As a result of the stipulations, the only remaining issues for trial were how Murphy was going to pay his arrearages and whether maintenance should be modified or terminated.

¶14    Following the final day of trial, but before the circuit court entered its final judgment, Murphy began working for another healthcare provider and his income increased significantly. The court held a status conference on October 25, 2019, and, at Holland's request, it entered a second interim order. This order, which we refer to as the "October 2019 order,"[3] increased the monthly maintenance payments from $10,000 to $15,000 and ordered Murphy to liquidate certain accounts to pay down his arrearages.

¶15    The parties submitted proposed findings of fact and conclusions of law. Then, in September 2020, the circuit court issued its findings of fact, conclusions of law, and judgment, which we refer to as the "2020 judgment." In the 2020 judgment, the court determined that there had been a substantial change of circumstances warranting a termination of maintenance. Although Murphy had asked the court to terminate his maintenance obligation retroactively as of January 2016, the court determined that maintenance should instead be terminated in October 2020 when Murphy turned sixty-five. In broad strokes, the court determined that:  both parties were at retirement age; the system set up by the arbitrator had proven to be unworkable; Holland had received substantial

---

[3] Throughout their briefing, the parties refer to the circuit court's oral decision in October 2019. The court did not enter any written order memorializing its decision until December 2019, but, following the parties' lead, we use the date of the court's oral decision when referring to this event.

maintenance payments over the past ten years and could be self-supporting once Murphy paid the arrearages that he currently owed; Murphy's assets had been drained; and Murphy could not continue to pay maintenance and at the same time meet his needs and save for retirement.

¶16    At the same time, the circuit court determined that Holland's "substantial" attorney fees would "likely eat away at her ability to live," and that it was reasonable for Murphy to contribute toward the payment of those fees. Therefore, the court's 2020 judgment invited the parties' submissions on the amount of fees it should order Murphy to pay.    After considering those submissions, the court issued an order requiring Murphy to contribute a total of $102,505 payable directly to Holland's attorneys over two years.

¶17    We provide additional background about the arguments and evidence introduced during the circuit court proceedings, the stipulations resolving the contempt sanctions, and the court's reasoning regarding termination of maintenance and attorney fees as needed below.

## DISCUSSION

¶18    As stated above, Holland appeals the 2020 judgment terminating maintenance, and Murphy cross-appeals the provision in the judgment and subsequent order requiring him to contribute to Holland's attorney fees beyond the amount he agreed to pay to purge his contempt.    We address the appeal and cross-appeal in turn.

### I.  Holland's Appeal Regarding Maintenance

¶19    We begin by setting forth principles regarding maintenance and motions to modify maintenance.    There are two distinct but related objectives to

7

maintenance—support and fairness. *LaRocque v. LaRocque*, 139 Wis. 2d 23, 32-33, 406 N.W.2d 736 (1987). A maintenance award should "support the recipient spouse in accordance with the parties' needs and earning capacities …." *Rohde-Giovanni v. Baumgart*, 2004 WI 27, ¶29, 269 Wis. 2d 598, 676 N.W.2d 452. It should also result in "a fair and equitable financial arrangement between parties." *Id.* Generally speaking, maintenance is not meant as a permanent annuity. *Hefty v. Hefty*, 172 Wis. 2d 124, 138, 493 N.W.2d 33 (1992). The goal is for both parties to maintain, when possible, a standard of living reasonably comparable to the one the parties enjoyed "'in the years immediately before the divorce and could anticipate enjoying if they were to stay married.'" *Id.* at 134 (emphasis omitted) (citing *LaRocque*, 139 Wis. 2d at 36).

¶20     At the time of a divorce, the circuit court must determine whether to order maintenance payments in any amount, and, if so, it must choose between a limited-term or indefinite maintenance and set the amount. In making these determinations, the court considers a non-exhaustive list of factors enumerated in WIS. STAT. § 767.56(1c)[4] in light of the dual objectives of support and fairness. *See LaRocque*, 139 Wis. 2d at 32-33.

---

[4] WISCONSIN STAT. § 767.56(1c) states that, in a divorce judgment, "the court may grant an order requiring maintenance payments to either party for a limited or indefinite length of time … after considering all of the following" factors summarized here: (a) the length of the marriage; (b) each party's age and physical and emotional health; (c) the division of property made under WIS. STAT. § 767.61; (d) each party's educational level at the time of marriage and at the time the action is commenced; (e) the earning capacity of the party seeking maintenance; (f) the feasibility that the party seeking maintenance can become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage and, if so, the length of time necessary to achieve this goal; (g) the tax consequences to each party; (h) any mutual agreement made by the parties before or during the marriage; (i) the contribution by one party to the education, training, or increased earning power of the other; and (j) such other factors as the court may in each individual case determine to be relevant.

(continued)

¶21    Once maintenance is ordered, the circuit court may modify the order pursuant to WIS. STAT. § 767.59(1c). A party seeking a modification must "demonstrate that there has been a substantial change in circumstances warranting the proposed modification." *Rohde-Giovanni*, 269 Wis. 2d 598, ¶30.

¶22    When evaluating a modification motion, the circuit court first considers the threshold question of whether the party seeking the modification has proven a substantial change in circumstances. *Id.* The "focus" of this inquiry should be on "any financial changes the parties have experienced." *Id.*; *see also* *Gerrits v. Gerrits*, 167 Wis. 2d 429, 437, 482 N.W.2d 134 (Ct. App. 1992). "[F]or purposes of evaluating a substantial change in the parties' financial circumstances … the appropriate comparison is to the set of facts that existed at the time of the most recent maintenance order, whether that is the original divorce judgment or a previous modification order." *Kenyon v. Kenyon*, 2004 WI 147, ¶27, 277 Wis. 2d 47, 690 N.W.2d 251.

¶23    If the circuit court finds that there has been a substantial change in circumstances, it must then determine whether and how maintenance should be modified. *See id.*, ¶3. In making this decision, the court "reconsiders the [statutory] factors used to arrive at the initial maintenance award" and the "dual maintenance objectives of support and fairness."[5] *Id.*, ¶¶13, 39; *see also* *Rohde-*

_____

WISCONSIN STAT. § 767.56(1c) has been renumbered from its previous designation as WIS. STAT. § 767.26. *See* 2005 Wisconsin Act 443, § 110. Earlier cases make reference to these same factors as the § 767.26 factors. *See, e.g.*, *Rohde-Giovanni v. Baumgart*, 2004 WI 27, ¶13, 269 Wis. 2d 598, 676 N.W.2d 452 (citing § 767.26 (1999-2000)).

[5] As the *Rohde-Giovanni* court noted, "the correct test regarding modification of maintenance should consider fairness to both of the parties under all of the circumstances, not whether it is unjust or inequitable to alter the original maintenance award." *Rohde-Giovanni*, 269 Wis. 2d 598, ¶32.

9

*Giovanni*, 269 Wis. 2d 598, ¶¶28-29; *Vander Perren v. Vander Perren*, 105 Wis. 2d 219, 230, 313 N.W.2d 813 (1982) (determining that an order terminating maintenance was arbitrary because the circuit court did not consider the statutory factors). In its analysis, the circuit court needs to take into account only those statutory factors that are relevant to the facts presented. *DeLaMatter v. DeLaMatter*, 151 Wis. 2d 576, 586, 445 N.W.2d 676 (Ct. App. 1989).

¶24 We begin our analysis by resolving the parties' dispute over the applicable standard of review. We then turn to Holland's arguments that there had been no substantial change in the parties' circumstances, and that the circuit court should not have terminated maintenance.

### A. Standard of Review

¶25 Holland cites *Murray v. Murray* for the proposition that the existence of a substantial change in circumstances is an issue of law reviewed de novo. *See Murray v. Murray*, 231 Wis. 2d 71, 77, 604 N.W.2d 912 (Ct. App. 1999). That may have been a correct statement of the law when *Murray* was decided. However, our supreme court has since clarified that we review a circuit court's determination that there has been a substantial change in circumstances for an erroneous exercise of discretion. *Rohde-Giovanni*, 269 Wis. 2d 598, ¶17; *see also Cashin v. Cashin*, 2004 WI App 92, ¶44, 273 Wis. 2d 754, 681 N.W.2d 255 (explaining that *Rohde-Giovanni* changed the standard of review). This same standard is applied when reviewing the circuit court's ultimate decision to modify or terminate a previous maintenance award based on the statutory factors and dual objectives of maintenance. *See Cashin*, 273 Wis. 2d 754, ¶¶42-44. "A circuit court erroneously exercises its discretion when it fails to consider relevant factors, bases its award on factual errors, makes an error of law, or grants an excessive or

inadequate award." ***Rohde-Giovanni***, 269 Wis. 2d 598, ¶18. A purported error of law by the circuit court in determining maintenance is reviewed de novo. ***Id.***, ¶19.

## B. Substantial Change in Circumstances

¶26 Having clarified the proper standard of review, we turn to Holland's arguments that the circuit court erred when it determined that Murphy satisfied his burden to prove a substantial change in circumstances. We reject each of these arguments for reasons we now explain.

¶27 Holland argues that the circuit court erred when it considered whether circumstances had substantially changed since the date of the divorce. She contends that the proper point of comparison was October 2019 because the court's October 2019 order was "the most recent maintenance modification" order. According to Holland, the court "converted maintenance from a percentage ... to a fixed payment" of $10,000 in May 2018, and then in October 2019, the court again modified the amount of maintenance to $15,000. Relying on ***Kenyon***, 277 Wis. 2d 47, she contends that the court was limited to considering whether circumstances had changed since October 2019. We reject this argument for two reasons, either of which is sufficient to resolve this issue.

¶28 First, Holland forfeited this argument by not timely raising it during the circuit court proceedings, and we discern no good reason to overlook her forfeiture in this case. Holland did not argue at any time prior to the issuance of the 2020 judgment that the court was limited to considering financial changes since the last interim order. The closest she came to this topic was when she asserted the following in her proposed findings of fact and conclusions of law: "Whether the analysis compares the parties today to the parties at the time of the divorce, or October 25, 2019, when maintenance was last adjusted, Dr. Murphy

11

has failed to meet his burden to show a substantial change in his income or plans for future employment." Holland did not advance the argument that the court was limited to considering financial changes since October 25, 2019, until after the court issued the 2020 judgment, which contained its analysis of changes that had occurred since the divorce.[6]

¶29 As a general matter, an issue must be properly "raised in the circuit court to be eligible for review upon appeal." *Schinner v. Schinner*, 143 Wis. 2d 81, 94 n.5, 420 N.W.2d 381 (Ct. App. 1988). The forfeiture rule exists in large part so that courts and litigants "have notice of the disputed issues as well as a fair opportunity to prepare and address them in a way that most efficiently uses judicial resources." *State v. Agnello*, 226 Wis. 2d 164, 173, 593 N.W.2d 427 (1999). The forfeiture rule also prevents "sandbagging" errors—that is, "failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal." *State v. Huebner*, 2000 WI 59, ¶12, 235 Wis. 2d 486, 611 N.W.2d 727. Without the forfeiture rule, attorneys "might be induced to build in an error to ensure access to the appellate court," notwithstanding their failure to raise the issue at trial. *Vollmer v. Luety*, 156 Wis. 2d 1, 11, 456 N.W.2d 797 (1990). As stated above, Holland did not raise this argument in her pre-judgment submission. She advanced it only after the court issued an adverse decision, when she was preparing to appeal. The policies underlying the forfeiture rule support its application here.

---

[6] Specifically, Holland first raised the argument in a motion for reconsideration of the 2020 judgment, and then in a motion to stay that judgment.

¶30    Second, even if Holland had not forfeited the argument, we would conclude that the rule from *Kenyon* did not limit the circuit court's consideration to financial changes that occurred after the October 2019 order. In *Kenyon*, there had been a previous proceeding in which the circuit court entered a final order modifying maintenance, and a party sought a subsequent modification in a second proceeding. *Kenyon*, 277 Wis. 2d 47, ¶¶16-17. In such cases, our supreme court explained, "it would be inappropriate to use the facts surrounding the original divorce judgment as a baseline for an evaluation of any subsequent substantial change" because the court "already found the parties' original financial circumstances to be substantially changed in the first modification proceeding." *Id.*, ¶16. The *Kenyon* court further explained that, "at a second modification proceeding, the operative maintenance award from which relief is sought is embodied in the … latest modification order, which ... was necessarily based on a finding of substantial change in circumstances from those existent at the time of the original divorce judgment." *Id.*, ¶17. Plainly, the rule from *Kenyon* is aimed at preventing the relitigation of facts and issues determined in "previous proceedings." *Id.*, ¶2.

¶31    Here, by contrast, neither the May 2018 order nor the October 2019 order constituted a decision in a "previous proceeding" that there had been a substantial change in circumstances warranting a modification. Instead, the parties requested these interim orders in this proceeding regarding the then-pending motions, at a time when the issues raised by Murphy's motion to modify maintenance were live and subject to ongoing litigation.[7] As the circuit court later

---

[7] The May 2018 order was requested by Murphy and the October 2019 order was requested by Holland. Neither party challenged the circuit court's authority to enter the interim orders or its exercise of discretion in doing so. *See* WIS. STAT. § 767.225(1)(d) (providing the

(continued)

explained, both interim orders had been stop-gap measures that attempted to ensure "that the status quo was maintained" until the trial was over and the court could issue a decision on Murphy's motion.[8] When the court issued the October 2019 order, it unequivocally stated that the order was "a short-term thing," and that it was not making any final adjudication of what maintenance should be. Neither of the orders reflected a finding that there has been a substantial change in circumstances warranting a modification, and neither order purported to alter the arbitrator's decision that Holland was entitled to half of the parties' gross income. Indeed, as Holland herself asserts in her appellate briefing, the "*system*" set up by the arbitrator to ensure an equal division of income was repeatedly modified following the divorce, but "*the overall equal division of marital income* continued from the time of the divorce until the [2020 judgment]." (Emphasis added.)

¶32    Based on the forfeiture rule and our consideration of the merits, we reject Holland's **Kenyon**-based argument. We conclude that, in issuing the 2020

court in "an action affecting the family" with the authority to temporarily require one spouse to pay for the "just and reasonable" maintenance of the other spouse "during the pendency of the action").

[8] The circuit court's explanation is well supported by the record. When the court entered the May 2018 order, it explained that it did not "want to have to be dealing with" the parties' accounting arguments "every time [Murphy's] income fluctuates," that the "cleanest thing to do" was to order a set amount per month, and that "that's what we'll do until we can sort out all the figures." The court set that amount at $10,000.

Then, during a status conference on October 25, 2019, Holland asked for this amount to be increased. At that time, her attorney correctly noted the following: that, despite the May 2018 order, "the original [arbitration award] stands"; that it had been "adjusted" in May 2018 based on Murphy's "substantial reduction in income and loss of jobs"; and that the intent of the May 2018 order had been to "split[] the income equally." Holland's attorney argued that $10,000 had been "half of the income" when the May 2018 order was entered, but that Holland should not be "stuck with" $10,000 per month after Murphy's income increased, and that Murphy's payments to Holland should be increased "to put him at 50/50." The circuit court accepted this position, and it entered the October 2019 order that Holland relies on in this appeal.

judgment, the circuit court properly considered whether there had been a substantial change in circumstances since the time of the divorce.

¶33    Holland next argues that, even if the circuit court properly considered whether the parties' circumstances had changed since the divorce, the court erred as a matter of law because the changes it considered were "foreseeable" at the time of the divorce and were not financial in nature. *See Rosplock v. Rosplock*, 217 Wis. 2d 22, 35-36, 577 N.W.2d 32 (1998) (concluding that rental income derived from a new investment property did not constitute a substantial change in circumstances because the parties "envisioned" that both spouses would invest funds obtained in the property division at the time of the divorce); *Jantzen v. Jantzen*, 2007 WI App 171, ¶¶15, 17, 21-22, 304 Wis. 2d 449, 737 N.W.2d 5 (concluding that the circuit court erred in terminating a limited-term maintenance award based on the aging of the parties, the termination of child support payments, and other circumstances "anticipated" at the time of the divorce).

¶34    To support her argument that the circuit court based its substantial change decision on foreseeable circumstances, Holland focuses on one specific paragraph in the 2020 judgment, which states:

> I conclude that there has been a substantial change of circumstances warranting the termination of maintenance. Dr. Murphy will be 65 years old. He should not be required to work multiple full-time jobs to support Ms. Holland, who is living the retired life in a beautiful Mexican condominium. The children are grown and the parties have virtually reduced all of the debt from the marriage, save some modest [educational] loans.

According to Holland, "[t]he parties and their children aging were undoubtedly foreseen at the time of divorce," and the reduction of the marital debts was a foreseeable direct result of the 2010 and 2012 arbitration orders.

¶35    We agree with Holland that at least two considerations noted in this paragraph were foreseeable at the time of the divorce—that Murphy would age and the children would age.  However, the circuit court issued a sixteen-page decision, which makes multiple findings of fact that compared the parties' financial circumstances at the time of the divorce with their circumstances at the time of the 2020 judgment.  In addition, even if a circuit court's exercise of discretion is inadequately expressed, we will generally search the record for reasons to sustain the court's discretionary decision.  *See Schauer v. DeNeveu Homeowners Ass'n*, 194 Wis. 2d 62, 71, 533 N.W.2d 470 (1995).  Here, when we examine the 2020 judgment in its entirety together with the record, we find ample reasons to sustain the court's decision, as we now explain.

¶36    First, Murphy's 2015 motion and supplemental motions to modify maintenance alleged several changes in his circumstances.  One notable alleged change was that Murphy lost his Medicare billing privileges.  As a result he lost his primary source of income and his medical license was revoked in at least one state.  Although some fluctuations in income were foreseeable given Murphy's line of work, his on-and-off difficulties with his billing privileges and licensure and resulting reduction of income was an unforeseen change in his financial circumstances.

¶37    Second, the circuit court's findings of fact demonstrate that *both* parties experienced substantial and unforeseeable changes in their assets since the divorce.  For Murphy's part, he had accrued significant debts that encumbered his

limited assets—largely due to his unwise investment choices. The court found that, as a result of his poor financial decision making, the "unworkability" of the system set up by the arbitrator, and the fact that Holland's allocation of money from the joint account was "not properly audited," Murphy "found himself in endless loops of arrearages from faulty data over which he had no control." By 2020, he had been required to transfer all but one of his retirement accounts to Holland to satisfy his maintenance arrearages. For Holland's part, she had acquired hundreds of thousands of dollars in assets from Murphy's retirement funds—a result that was not foreseeable at the time of divorce. Based on our review of the record, the court's findings about unforeseeable shifts in the parties' retirement savings are not clearly erroneous.

¶38 For these reasons, we reject Holland's argument that the parties could have reasonably foreseen the changes in their financial circumstances when the divorce judgment was entered. We conclude that the circuit court did not err when it relied on these unforeseeable changes to determine that there had been a substantial change in circumstances.

¶39 We now briefly address two arguments that Holland makes about substantial changes in circumstances that we have not already directly addressed in our discussion above. Holland argues that there was no substantial change in circumstances because Murphy's annual income at the time of the 2020 judgment was $560,000—the same as when the circuit court issued the October 2019 order, and higher than what it was at the time of the divorce. This argument is not persuasive because it is founded on a myopic focus on *income* as the sole measure of a party's financial circumstances. Even if Holland is correct that Murphy's income was higher when the court made its determinations in 2020 than it was when they were divorced, the parties' relative *savings* are also a pertinent aspect of

17

their financial circumstances. Here, as discussed above, the court based its substantial change decision on a comprehensive review of the parties' income, savings, and other considerations, and its decision was reasonable under the circumstances.

¶40    Holland also argues that Murphy was himself to blame for many of his financial woes—that he squandered his income on penny stocks when he should have been using it to pay maintenance, resulting in the "endless loops of arrearages," and that his loss of retirement accounts to Holland "reflects his repeated violations of his obligations" under the 2010 divorce judgment and the 2012 arbitration award. According to Holland, a "loss of assets due to contemptuous conduct cannot justify a termination of maintenance."

¶41    To the extent that Holland intends to argue that Murphy's loss of assets cannot constitute a substantial change in circumstances as a matter of law, we reject that argument. Holland's characterization of the underlying facts is not fully consistent with the circuit court's findings of fact, which, again, are not clearly erroneous. And above all else, Holland cites no legal authority to support the proposition that courts are obligated to consider who is at fault for a party's reduced financial circumstances as the determinative factor when deciding whether there has been a substantial change of circumstances. Instead, her argument appears to be more appropriately aimed at the court's discretionary determinations regarding the support and fairness objective of maintenance, which we discuss below.

¶42    For all of these reasons, we conclude that the circuit court did not erroneously exercise its discretion when it determined that there was a substantial change in circumstances.

## C. Warranting Termination of Maintenance

¶43 As discussed above, once the circuit court determines that there has been a substantial change in circumstances, it then considers whether that change warrants modification or termination of maintenance. When making this determination, the circuit court "reconsiders" the factors enumerated in WIS. STAT. § 767.56(1c) and the dual support and fairness objectives of maintenance. *Kenyon*, 277 Wis. 2d 47, ¶¶13, 39.

¶44 Here, the circuit court addressed each of the WIS. STAT. § 767.56(1c) factors in support of its decision to terminate maintenance,[9] and it also made other findings that it determined were relevant to the parties' circumstances and the dual objectives of maintenance. *See* § 767.56(1c)(j) (permitting the court to consider "such other factors as the court may in each individual case determine to be relevant"). We now recount a few of the court's findings, which provide reasonable support for its decision.

¶45 The circuit court found that almost all of the parties' marital debts had been paid. At the same time, however, the court found that the parties were

---

[9] Applying the WIS. STAT. § 767.56(1c) factors to the evidence presented, the circuit court here made the following specific findings that we now summarize: (a) the parties had a long-term marriage; (b) both were at or near retirement age and in good health; (c) initially, the marital assets were equally divided, but both parties dissipated those assets; Holland had been living a lavish lifestyle and had not kept up with her tax obligations and Murphy repeatedly made bad investments; (d) both parties were well-educated; (e) in spite of Holland's education, she never tried to find employment after the divorce; as of 2020, both parties were at retirement age so it was reasonable that they could choose not to work; (f) neither party was able to maintain the standard of living at which they lived during the marriage; (g) any maintenance and any interest thereon was deductible to Murphy and includible to Holland; (h) neither party raised any evidence related to any mutual agreement made before or during the marriage; (i) the evidence showed that Murphy paid his own way through medical school; however, given Murphy's rigorous hours, Holland contributed to his earning ability by taking care of the children and the home.

unable to maintain the standard of living they had during their marriage. That standard had been "built on a house of cards" and had been unsustainable post-divorce. Following the divorce, Murphy continued to squander money through bad investments, and Holland lived beyond her means and failed to keep up with her own debts and taxes.

¶46    Regarding the system set up by the arbitrator, the circuit court found that it had proven to be unworkable. It was unworkable in part because it was too complicated, in part because it had not been properly audited, and in part because both parties struggled to manage their finances.

¶47    Additionally, the circuit court found that Holland's total control over Murphy's finances and the failures of the annual "true-up" process resulted in Murphy "not receiving much of the money that he earned working thousands of hours every year." More specifically, Murphy found himself in "endless loops of arrearages," the result of which made his income insufficient to meet his living expenses, much less to allow him to save for future events. In 2015, for example, if Murphy had fully paid his maintenance obligations and arrearages, the court found he would only have $22,798 in net disposable income for the year.[10] This

---

[10] Holland disputes this calculation as the product of "mathematical errors" by the circuit court, but we are not persuaded that the court's finding is clearly erroneous. Specifically, Holland argues that the court "double counted" $44,253 that Murphy used to pay Holland's share of marital debts, and that $62,100 of the amount were arrearages that Murphy ultimately paid through a transfer of assets rather than income. We have reviewed the record items Holland cites, and it is not clear that they support Holland's assertion of error, mathematical or otherwise. In his response brief, Murphy provides a detailed counterargument regarding these line items, and Holland does not address Murphy's counterargument or the purportedly erroneous calculations in any way in her reply brief. Accordingly, we deem her argument on that point conceded. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession).

amount would have been almost entirely absorbed by the mortgage payment on his Door County house, and he would have had only $1,510 to cover "all other living expenses not controlled by Ms. Holland."

¶48 The circuit court found that Holland had received "substantial" maintenance from Murphy since the parties divorced in 2010.[11] Additionally, as discussed above, a number of retirement accounts that had been awarded to Murphy in the divorce were later transferred to Holland, and Holland had received "other financial benefits" from Murphy as well.[12] Holland had purchased a "high-end" condominium in Mexico, where she was living "the retired life." Although she had already spent many of the funds she had received from Murphy,[13] she had $600,000 in retirement savings and would soon be eligible to receive social security income of at least $1,400 per month. The court determined that, after Murphy paid the additional $385,148.50 in arrearages that the parties stipulated he

---

[11] The circuit court calculated the total amount of maintenance payments through 2019 as $1,689,434. Holland asserts that the correct calculation is $1,409,632. According to Holland, the $234,244 difference was classified as maintenance on her taxes, but in fact it was a payment by Murphy representing Holland's share of the parties' marital debts. We assume without deciding that Holland's description of this item is correct but, even so, Holland has not shown that she was prejudiced by the court's calculation of total maintenance payments. That is, we are not persuaded that the court's outcome would have been any different had it determined that Holland received a total of $1,409,632 rather than $1,689,434 in maintenance payments since 2010. *See* WIS. STAT. § 805.18(2); ***Martindale v. Rupp***, 2011 WI 113, ¶32, 246 Wis. 2d 67, 629 N.W.2d 698 (reversal may be unwarranted unless there is a reasonable possibility that an error contributed to the outcome of the proceeding).

[12] The circuit court calculated the value of the other financial benefits (not including the retirement accounts) as $373,562. Holland does not challenge this finding.

[13] Holland takes issue with the circuit court's description of her lifestyle as "lavish." She asserts that, "[w]hen compared to Dr. Murphy's spending, the facts at trial show that Ms. Holland's spending was not 'lavish.'" Whether or not that comparison is apt, we agree with Holland it is ultimately Holland's decision how best to use her income. Nevertheless, we conclude that the court did not err when it stated that some of her financial problems could be alleviated if she scaled back on her expenditures. *See **Rohde-Giovanni***, 269 Wis. 2d 598, ¶43.

owed, Holland "should be able to be self-supporting" with the social security income, the retirement funds, an anticipated inheritance from her mother,[14] and her lower cost of living in Mexico.

¶49    Meanwhile, the circuit court found that, despite working multiple full-time jobs, Murphy had "very limited assets." The court found that he was unable to save for his future retirement and pay maintenance at the same time. The court concluded that, under the circumstances, Murphy "should not be required to work multiple full-time jobs" to support Ms. Holland. After his maintenance obligations were terminated, Murphy would have the option to continue to work multiple jobs to build up funds for retirement, or to reduce his hours if he chose to do so.

¶50    Having carefully reviewed the record, we conclude that the circuit court did not erroneously exercise its discretion by terminating maintenance when Murphy turned sixty-five. As discussed above, the court considered all of the statutory factors that it determined to be relevant and made the above findings of fact, which are not clearly erroneous. The court considered Holland's need for support when it considered her ability to be self-supporting. It considered fairness to both parties when it considered their contributions to the marriage, their relative

---

[14] Holland argues that the circuit court erred in taking into account her expectation that she would be a beneficiary of her mother's estate at some point in the future. Yet, the case Holland cites in support of her argument is inapt. See *Selchert v. Selchert*, 90 Wis. 2d 1, 15, 280 N.W.2d 293 (Ct. App. 1979) (explaining that, in the context of *property division*, an expectation that a party would receive a future inheritance was "too remote for consideration"). She argues that there was no testimony in the record to support the court's finding, but Murphy's response brief cites to such testimony. And again, even if we were to assume that the circuit court should not have considered Holland's potential inheritance when she found that Holland would be able to support herself, we are not persuaded that the court would have reached any different outcome had it not considered Holland's own testimony on that point. See WIS. STAT. § 805.18(2); *Martindale*, 246 Wis. 2d 67, ¶32.

savings, and the unfairness of forcing Murphy, through an unworkable system, to continue to generate income in an attempt to maintain the unsustainable standard of living that the parties enjoyed during the marriage. Thus, the decision reached was a result of "'a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination.'" *Rohde-Giovanni*, 269 Wis. 2d 598, ¶18 (quoted source omitted).

¶51 We now address Holland's arguments to the contrary that are not already addressed above. Holland argues that the circuit court did not determine that she "could be self-supporting at the marital standard of living" without maintenance. Yet, as our supreme court has clarified, this standard is more properly stated as "the lifestyle that the parties enjoyed in the years immediately before the divorce *and could anticipate enjoying if they were to stay married*." *Hefty*, 172 Wis. 2d at 134 (emphasis in original) (citing *LaRocque*, 139 Wis. 2d at 36). Here, as discussed above, the circuit court determined that the marital standard of living had been built on a house of cards and that neither party could sustain that standard of living post-divorce. We discern no error of law or fact and no erroneous exercise of discretion.

¶52 Holland also argues that the circuit court erred when it allowed Murphy, through his motion to modify maintenance, to relitigate issues that he could have but did not challenge through judicial review of the 2010 and 2012 arbitration awards. According to Holland, because the arbitrator ordered maintenance based on a percentage of the parties' total income, the "system" set up by the arbitrator would accommodate ups and downs in income without the need for further review. She contends that the court improperly allowed and relied on testimony about "the history of the marriage, the relative contributions of the

23

parties to the marriage," and other issues that were "previously litigated at the time of the divorce." As a result, Holland asserts, the court "essentially allowed" Murphy to "retry the basis of the original indefinite maintenance award, the equal division of all income, and the process established by the arbitrator" to ensure that Murphy's "income was accounted for and the substantial marital debts were paid."

¶53     We reject this argument for at least two reasons. First, Holland did not object to any such evidence on those grounds during the trial.[15] *State v. Mercado*, 2021 WI 2, ¶36, 395 Wis. 2d 296, 953 N.W.2d 337 (citing WIS. STAT. § 901.03(1) for the proposition that parties must preserve evidentiary objections for purposes of appeal). Second, we disagree with the central premise of Holland's argument—that the termination of maintenance amounts to a "relitigation" of issues decided in the original divorce judgment and the 2012 arbitration award. As the case law explains, "maintenance is always subject to modification upon a showing of the requisite change in circumstances." *Nichols v. Nichols*, 162 Wis. 2d 96, 103, 469 N.W.2d 619 (1991); *see also* **Hefty**, 172 Wis. 2d at 138 (explaining that an award of indefinite maintenance at a percentage basis "is not necessarily permanent" and may be adjusted as the circumstances warrant). Indeed, if maintenance has not been previously modified, the court *must* consider the facts at the time of the divorce to determine whether modification is warranted based on a change of circumstances since the divorce. Here, the circuit court's determinations—that there had been a substantial change in circumstances and that the changed circumstances warranted modification—were  founded on post-

---

[15] To the contrary, Holland solicited testimony about the history of the marriage and the relative contributions of the parties and included pages of facts about those topics in her proposed findings of fact and conclusions of law.

divorce events and did not constitute a relitigation of issues decided during the divorce.

¶54 Holland also argues that the circuit court erred by terminating Murphy's requirement to pay maintenance at age sixty-five because he does not have a present plan to retire. Contrary to Holland's suggestion, the court's decision to terminate maintenance was not based on Murphy's "hypothetical retirement." It was instead based on the court's consideration of the WIS. STAT. § 767.56(1c) factors and the dual objectives of maintenance. Holland does not cite any legal principle that prevented the court from considering Murphy's need to save for a future retirement as part of its reconsideration of the statutory factors and objectives of maintenance.

¶55 Finally, Holland argues that, "[i]n trying to be fair to Dr. Murphy's retirement needs, the circuit court failed to consider fairness to Mrs. Holland." Holland contends that the evidence shows that Murphy was a principal architect of both parties' financial problems. She further contends that a significant cause of Murphy's dwindling retirement savings was that he had been ordered to transfer retirement accounts to Holland to satisfy substantial maintenance arrearages and contempt orders. She asserts that "[t]here is no Wisconsin case law which supports a termination of an indefinite maintenance award" on the basis that "a contemnor needs to save money to replace assets lost due to his noncompliance with court orders." She further argues that, having shared in "the debt incurred to cover Dr. Murphy's marital waste," she should "continue to share in [his] earnings," which reflect her significant "contributions to his earning capacity." Holland cites several cases which stand for the general proposition that a court must be fair to both parties and not leave one party with a windfall while the other

party is forced to live well below the previous marital standard of living they once enjoyed.

¶56    Regardless of the merits of Holland's arguments about fairness, she advanced these same arguments during the circuit court proceedings and the court ultimately rejected them.  The circuit court, not this court, is in the best position to weigh competing considerations about support and fairness, and the court did so here after an exhaustive eight-day trial.  Holland has not identified any legal error in the court's reasoning, nor has she persuaded us that the court erroneously exercised its discretion.  *See **Rohde-Giovanni v. Baumgart***, 2003 WI App 136, ¶7 n.1, 266 Wis. 2d 339, 667 N.W.2d 718, *affirmed by **Rohde-Giovanni***, 269 Wis. 2d 598 (discussing the standard of review of maintenance decisions).

¶57    To the extent that Holland makes any other arguments that we have not explicitly addressed, we reject them under our standard of review.  Boiled down, Holland's arguments reflect her dissatisfaction with the circuit court's determinations as to the weight and credibility of the evidence and the court's balancing of the WIS. STAT. § 767.56(1c) factors in light of the support and fairness objectives of maintenance.  Holland's dissatisfaction with the court's decision is not grounds for this court to overturn it as an erroneous exercise of discretion.

¶58    For all the above reasons, we conclude that the circuit court did not erroneously exercise its discretion when it terminated maintenance.

## II.  Murphy's Cross-Appeal Regarding Attorney Fees

¶59    In his cross-appeal, Murphy asserts that the circuit court erred when it ordered him to contribute $102,505 toward Holland's attorney fees in addition to

26

the $100,000 in fees he agreed to pay to purge his contempt. In most matters, Wisconsin follows the "American Rule," and parties are responsible for paying their own attorney fees. *See Estate of Kriefall v. Sizzler USA Franchise, Inc.*, 2012 WI 70, ¶72, 342 Wis. 2d 29, 816 N.W.2d 853. However, WIS. STAT. § 767.241(1)(a) provides broad authority for attorney fee awards in actions affecting the family. Pursuant to that statute, a circuit court can, "after considering the financial resources of both parties," order either party "to pay a reasonable amount for the cost to the other party of maintaining or responding to an action affecting the family and for attorney fees." A circuit court may also award attorney fees in a family law action based on the doctrine of "overtrial." *Ondrasek v. Ondrasek*, 126 Wis. 2d 469, 484, 377 N.W.2d 190 (Ct. App. 1985).

¶60 We review a circuit court's attorney fee award for an erroneous exercise of discretion. *Standard Theatres, Inc. v. DOT*, 118 Wis. 2d 730, 747, 349 N.W.2d 661 (1984). We do not substitute our judgment for that of the circuit court but instead examine the record in assessing whether the court's determination is based on the appropriate legal principles and the facts of record. *See Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 987-88, 542 N.W.2d 148 (1996).

¶61 Before addressing Murphy's arguments, we provide additional background that is relevant to the cross-appeal. As stated above, Holland and Murphy both sought contempt sanctions against each other for allegedly violating arbitration and circuit court orders related to maintenance. For her part, Holland filed several motions for contempt, each one requesting "the costs and fees [she] incurred due to [Murphy's] contempt."

27

¶62    Then, on July 9, 2019, during the sixth day of the trial, the parties informed the circuit court that they had entered into an agreement resolving the contempt motions.   As Holland's counsel explained on the record, the parties stipulated that Murphy was in contempt and, further, that he could purge his contempt, in part, by paying $100,000 of Holland's attorney fees:

> [T]he parties stipulate that Dr. Murphy is in contempt [as to certain maintenance and arrearage payments].  The parties stipulate that $100,000 is added to the [total arrearage amount stipulated to by the parties,] bringing that total to $385,148.50, and that $100,000 is for attorney fees and it is not taxable to [Holland] or deductible to Dr. Murphy. Accordingly, all other claims to attorney fees by both parties are dropped ….
>
> ….
>
> We also agreed that with respect to the contempt, the sole remedy for the contempt is the $100,000 that's being added to the arrearage.  There is no request for jail time, there is no request for any other sanction.  The only sanction is the $100,000 and that's it.  So basically, it's a contempt and he purges the contempt by adding it to the arrearage and that resolves it.

The parties' agreement was later memorialized in a written stipulation.   That agreement provided, in pertinent part, that "[a]ll pending contempt motions are resolved," and that "[a]ll outstanding but unresolved claims for attorney's fees are resolved and fully incorporated into [the new arrearage balance]."

¶63    Months later, after the trial was over, the parties submitted proposed findings of fact and conclusions of law.  In her post-trial submission, Holland did not ask the circuit court to order Murphy to pay additional fees for his "contemptuous conduct."   She did, however, argue that she had incurred significant legal fees as a result of Murphy's "overtrial" and "unreasonable use of the legal process," and she asked the court to take those fees into account when

determining how the arrearage would be paid and "the term of maintenance going forward."

¶64 When the circuit court issued the 2020 judgment terminating maintenance, the court also determined that it would order Murphy to make an additional contribution toward Holland's attorney fees. Specifically, the court determined that Murphy's unreliability with respect to maintenance payments caused the "multiple court hearings and the termination of the arbitrator," and that "the legal fees incurred by Holland are substantial and will likely eat away at her ability to live." The court ordered Holland to "submit an accounting of fees incurred not covered by the contempt stipulation" and indicated that it would determine an amount that Murphy would have to pay directly to Holland's attorney each month.

¶65 Holland then submitted an itemized statement of her attorney fees. Her submission purported to separate the fees that had been related to contempt issues from those that had not, and requested approximately $218,000 in "Fees and Costs not related to Contempt" that Holland had incurred since January 1, 2015. After both parties submitted additional briefing, the circuit court explicitly found that Holland's attorney fees were reasonable. Nevertheless, the court explained that, at the time it ordered attorney fees "as part of the judgment," it had "envisioned" that the fee award would cover only those fees incurred after the parties' July 9, 2019 stipulation. According to the court's calculations, Holland had incurred $102,505 in fees after July 9, 2019, and it ordered Murphy to pay that amount. Although Murphy challenges the court's authority to enter the award and its exercise of discretion in doing so, neither party challenges the court's calculation.

¶66    We pause to observe that the circuit court did not expressly state whether it was awarding the fees pursuant to its authority under WIS. STAT. § 767.241 or as a sanction for overtrial. On appeal, the parties disagree about the basis for the court's award. Although we proceed with the assumption that the court made the fee award under § 767.241, we now briefly address Holland's arguments about overtrial.

¶67    Holland asserts that the circuit court awarded fees based on Murphy's overtrial. If accurate, this assertion would be significant. This is because, when awarding fees under § 767.241(1)(a), a circuit court must consider and make findings about the reasonableness of the fee, the receiving party's need for contribution, and the paying party's ability to pay. *Johnson v. Johnson*, 199 Wis. 2d 367, 377, 545 N.W.2d 239 (Ct. App. 1996). By contrast, when awarding fees based on overtrial, a circuit court is not required to consider the respective parties' need or ability to pay. *See Ondrasek*, 126 Wis. 2d at 484.

¶68    Here, upon our review of the record, we cannot conclude that the circuit court based its fee award on the overtrial doctrine. Although Holland mentioned overtrial in her post-trial submissions, the court did not expressly invoke that doctrine in its judgment and subsequent order. Nor did it make findings that would be required to support an award based on overtrial. *See id.* (providing that the overtrial doctrine may be invoked in family law cases when one party's unreasonable approach to litigation causes the other party to incur extra and unnecessary fees). The court mentioned that Murphy had been "unreliable" with respect to maintenance payments, but it did not discuss his approach to litigation.

30

¶69    We now turn to Murphy's primary arguments regarding the application of WIS. STAT. § 767.241. Murphy contends that the circuit court's order was contrary to the parties' July 9, 2019 stipulation. He also contends that the court did not make findings necessary to justify its order, and that the findings it did make were clearly erroneous. We address these arguments in turn.

## A.  The Stipulation

¶70    Murphy argues that the circuit court was without legal authority to award additional fees beyond the $100,000 in fees agreed to in the July 9, 2019 stipulation. He contends that, in resolving "all" claims for attorney fees, the stipulation at issue unambiguously divested the court of its broad authority under WIS. STAT. § 767.241(1)(a) to require Murphy to pay any additional amount of Holland's attorney fees. The meaning of a stipulation is generally a question of law reviewed de novo. *Jalovec v. Jalovec*, 2007 WI App 206, ¶10, 305 Wis. 2d 467, 739 N.W.2d 834.

¶71    Attorney fees are a type of remedy available for contempt of court. *Benn v. Benn*, 230 Wis. 2d 301, 311, 602 N.W.2d 65 (Ct. App. 1999). The stipulation at issue in this case resolved the parties' competing contempt motions, and also addressed "all *outstanding* but unresolved claims for attorney's fees." (Emphasis added.) The circuit court interpreted this language to mean that all claims for fees incurred as of the date the parties entered this stipulation were resolved,[16] but not that the court was precluded from requiring Murphy to pay fees

---

[16] Holland does not appeal the fee award and, therefore, she has not preserved any challenge to the circuit court's decision not to award any attorney fees that she had incurred up through July 9, 2019.

that Holland incurred after that date. We agree with this interpretation. In the context of debts, the word "outstanding" is commonly understood to mean debts that have already been incurred—that is, those debts that "continue[]" to exist and remain "unpaid." *Outstanding*, https://www.meriam-webster.com/dictionary/outstanding (last visited Nov. 30, 2021). We therefore agree that the stipulation resolving "all outstanding but unresolved claims for attorney's fees" did not prevent the court from entering a fee award under § 767.241(1)(a).

¶72    Murphy cites *Ceria M. Travis Academy v. Evers*, 2016 WI App 86, ¶18, 372 Wis. 2d 423, 887 N.W.2d 904, for the proposition that parties to litigation can, by stipulation, curtail the circuit court's statutory authority. We have no reason to disagree with this general proposition, but we conclude that it does not apply here. To the extent that the parties intended to curtail the court's authority under WIS. STAT. § 767.241(1)(a), we would expect them to have used explicit language that unambiguously expressed that intent. As discussed above, the parties did not do so when they entered the stipulation at issue in this case. Therefore, Murphy's reliance on *Ceria M. Travis Academy* is inapt.

## B. The Court's Exercise of Discretion Under WIS. STAT. § 767.241(1)(a)

¶73    We now address Murphy's argument that the circuit court erroneously exercised its discretion. As stated above, when awarding fees under WIS. STAT. § 767.241(1)(a), a court must consider the reasonableness of the fee, the receiving party's need for contribution, and the paying party's ability to pay. *Johnson*, 199 Wis. 2d at 377.

¶74    Here, the circuit court reviewed an itemized billing statement and expressly found that the fees charged by Holland's attorneys were "reasonable." Again, we review this determination for erroneous exercise of discretion.

*Standard Theatres, Inc.*, 118 Wis. 2d at 747. We give deference to the circuit court's decision because it witnessed first-hand the quality of the service rendered by counsel and is familiar with local billing norms. *Id.*; *see also* *Tesch v. Tesch*, 63 Wis. 2d 320, 334-35, 217 N.W.2d 647 (1974).[17]

¶75    Murphy makes various assertions in support of his argument that the fees charged by Holland's attorneys were unreasonable, but none are persuasive. Among other things, Murphy takes issue with Holland's use of a "team of pedigreed attorneys," the billing rate charged by the lead attorney and associates on Holland's case, and the amount of detail provided in the billing descriptions, and he asserts that the total bill "shock[s] the conscious." However, the circuit court, having observed the eight days of trial, multiple status conferences between trial dates, and the parties' respective approaches to litigation, was not persuaded by Murphy's arguments. The court's determination that Holland's attorney fees were reasonable is supported by the lengthy and fact-intensive proceedings in this case as well as the billing information provided to the court. Murphy may disagree with the court's determination and Holland's approach to litigation, but those are not valid reasons to upset the court's exercise of discretion in awarding additional attorney fees.

---

[17] On appeal, Murphy argues that appellate courts are in "as good a position as the trial court to assess the reasonableness of the fees" and therefore should not give deference to a circuit court's reasonableness determination. To be sure, some earlier cases suggested that, as part of its inherent supervisory power over the practice of law, our supreme court "may independently review the reasonableness of an attorney fee award." *First Wis. Nat. Bank v. Nicolaou*, 113 Wis. 2d 524, 537, 335 N.W.2d 390, 396 (1983); *see also* *Herro, McAndrews & Porter, S.C. v. Gerhardt*, 62 Wis. 2d 179, 184, 214 N.W.2d 401 (1974); *Theuerkauf v. Schnellbaecher*, 64 Wis. 2d 79, 93, 218 N.W.2d 295 (1974); *Thuot v. Fasting*, 260 Wis. 79, 86, 49 N.W.2d 906 (1951); *Touchett v. E Z Paintr Corp.*, 14 Wis. 2d 479, 488, 111 N.W.2d 419 (1961). However, this is no longer the law. In *Standard Theatres, Inc. v. DOT*, 118 Wis. 2d 730, 747, 349 N.W.2d 661 (1984), our supreme court clarified that the correct standard of review is erroneous exercise of discretion.

¶76 Murphy directs us to ***Kolupar v. Wilde Pontiac Cadillac, Inc.***, 2004 WI 112, ¶25, 275 Wis. 2d 1, 683 N.W.2d 58, which identifies factors that guide circuit courts in assessing the reasonableness of attorney fees. *See also* WIS. STAT. § 814.045.[18] Although it may have been better practice for the court to explain its reasonableness determination with specific reference to these factors, we are nevertheless satisfied that the court appropriately exercised its discretion in determining that the fees charged by Holland's attorneys were reasonable.

¶77 As noted above, in addition to making a reasonableness determination, the circuit court must also consider the needs of the party receiving the attorney fee award and the other party's ability to pay. ***Balaam v. Balaam***, 52 Wis. 2d 20, 31-32, 187 N.W.2d 867 (1971) (explaining that an award of attorney fees under WIS. STAT. § 767.225 is not warranted if "the [receiving party] is able to pay [their] own attorney out of income or assets," or if "the [paying party] does not have the ability to pay"). The needs of the payee are ordinarily determined by

---

[18] The factors set forth in ***Kolupar*** are summarized as: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. ***Kolupar v. Wilde Pontiac Cadillac, Inc.***, 2004 WI 112, ¶25, 275 Wis. 2d 1, 683 N.W.2d 58. We note that the standard stated in ***Kolupar*** has been changed by statute. WISCONSIN STAT. § 814.045(1), enacted in 2011, says that "in any action involving the award of attorney fees … or involving a dispute or the reasonableness of attorney fees, the court shall, in determining whether to award attorney fees and in determining whether the attorney fees are reasonable," consider a list of fifteen factors, which are similar to but not identical to the factors noted in ***Kolupar***.

To the extent that Murphy argues that it was unreasonable for the circuit court to award Holland attorney fees because Murphy was the prevailing party, we expressly reject that argument. WISCONSIN STAT. § 767.241 provides that a fee award may be made "to either party," and does not limit the court's authority to award fees only to those parties that have prevailed.

the receiving party's assets and income, earning capacity, age, health, special needs and the special needs of the children, if any, and their customary station in life. *Hirth v. Hirth*, 48 Wis. 2d 491, 180 N.W.2d 601 (1970). The ability of the other spouse to pay is usually determined by their income, assets, debts, age, and health. *Id.*

¶78 In this case, the circuit court expressly determined that Holland had a need for Murphy to contribute toward her attorney fees. As the court explained, "the legal fees incurred by Holland are substantial and will likely eat away at her ability to live." Despite Murphy's assertions to the contrary, the obvious interpretation of this finding is that, now that maintenance has been terminated, Holland would be at risk of not being able to support her living expenses if she had to use her savings to pay all of her "substantial" attorney fees.

¶79 To the extent that Murphy is arguing that the record does not support this finding or that it contradicts other parts of the circuit court's judgment, we disagree. We are satisfied that the court considered Holland's age, health, prior income, assets, earning capacity, and "customary station in life" before ordering Murphy to pay a portion of her attorney fees. Indeed, the court made findings on those subjects in other sections in the 2020 judgment and, as stated above, the court's findings in its written judgment are supported by the record. We conclude that the circuit court did not err when it determined that Holland needed assistance paying her attorney fees.

¶80 By contrast, the circuit court did not make any express finding regarding Murphy's ability to contribute toward Holland's attorney fees. "Failure by the [circuit] court to make specific findings of fact is not necessarily reversible error." *Jacobson v. American Tool Companies, Inc.*, 222 Wis. 2d 384, 394-95,

35

588 N.W.2d 67 (Ct. App. 1998) (citing *Hochgurtel v. San Felippo*, 78 Wis. 2d 70, 86, 253 N.W.2d 526 (1977)). On the contrary, "[w]e assume the court implicitly made those findings necessary to support its decision, and we accept those implicit findings if they are supported by the record." *Avon v. Oliver*, 2002 WI App 97, ¶23, 253 Wis. 2d 647, 644 N.W.2d 260. When a court fails to expressly make a necessary finding, we will affirm the court's decision if the necessary findings are clearly supported by the record, reverse the court's decision if a necessary finding is not so supported, or remand to the court to make additional findings. *Jacobson*, 222 Wis. 2d at 394-95 (citing *Chuck Wagon Catering, Inc. v. Raduege*, 88 Wis. 2d 740, 749, 277 N.W.2d 787 (1979)).

¶81 Here, it is not evident from the circuit court's decision that it actually considered Murphy's ability to pay. Moreover, there is some tension—at least on the surface—between the findings the court made in support of its decision to terminate maintenance and a hypothetical finding that Murphy had the ability to contribute $102,505 toward Holland's attorney fees. As discussed above, the court determined that, despite annual income of $560,000 at the time of the divorce, Murphy had "very limited assets" which were encumbered by significant debts, and that he would be unable to save for retirement and, at the same time, continue to make maintenance payments. Moreover, shortly after the court issued the 2020 judgment but before the court issued its subsequent order on fees, Murphy represented that he had once again lost his Medicare billing privileges, which may have affected his ability to generate income.

¶82 In so stating, we do not suggest that the circuit court could not have reasonably determined that Murphy did have an ability to pay. Nor do we suggest that the court could not do so on remand. We merely conclude that, under the circumstances, absent any express finding from the court, and given the potential

tension with the findings that the court did make, we are unable to conclude that the circuit court implicitly found that Murphy had an ability to pay.

¶83    For all of these reasons, we reverse the portions of the 2020 judgment and the subsequent order pertaining to the attorney fee award and remand to the circuit court for further consideration of the attorney fee issue.  In the interest of assisting the court in streamlining the proceedings on remand, we offer the following guidance.  Nothing in this opinion should be read to preclude the court from awarding $102,505 (or another amount) in attorney fees.  Nor should this opinion be read to circumscribe the court's authority to conduct further proceedings as it may see fit to resolve the attorney fee issue.  Instead, the court may consider whether, in its judgment, it would be appropriate to take new evidence or to decide this issue based on evidence and submissions that are already in the record, taking argument from the parties on this point as it determines is appropriate.[19]

## CONCLUSION

¶84    In sum, we reverse the portions of the circuit court's 2020 judgment and the subsequent order pertaining to the attorney fee award and remand to the circuit court for further consideration of the attorney fee issue and to make any findings necessary to support its decision.  All other aspects of the circuit court's judgment and order are affirmed.

---

[19] To the extent that either party attempts to make any other arguments on appeal, we reject them as undeveloped.  *See* **State v. Pettit**, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

*By the Court.*—Judgment and order affirmed in part; reversed in part and cause remanded with instructions.

Not recommended for publication in the official reports.